[No. 8,052.—In Bank.]
November 16, 1882.

# SPRING VALLEY WATER WORKS *v.* ANTONE SCHOT- TLER ET AL.

RULES OF BOARD AS TO NOTICE NO PART OF RECORD ON CERTIORARI.—Appeal from a judgment of the Superior Court of the City and County of San Francisco, denying the application of the Spring Valley Water Works for a writ of review, and confirming the action of the Board of Equalization of the city and county above named. The writ was sued out to review the action of the Board of Equalization in raising the assessment of the franchise of the Water Works above named, from five thousand dollars to five million dollars, and to have it vacated and set aside as being in excess of the jurisdiction of the Board. It was contended by appellant that no notice as required by law was given to the Water Works,. inasmuch as it was not given in accordance with a rule prescribed in advance by the board.

*Held:* On the authority of *Garretson* v. *Supervisors*, 9 P. C. L. J., 685, these rules are no part of the record and proceedings to be brought up on certiorari.

WAIVER OF OBJECTIONS TO FORM OF NOTICE—DISCRETION OF BOARD AS TO TIME OF NOTICE.—An application having been made by a taxpayer of the city and county, to the Board of Equalization, that the valuation of the franchise of the company be raised from five thousand dollars to fourteen million dollars. Notices to appear and show cause before the Board of Supervisors at their chambers in the New City Hall, on Friday, June 24th, at ten o'clock A. M., why the assessment of the Spring Valley Water Works should not be raised to fourteen million dollars, addressed to the President and Secretary of the Spring Valley Water Works, were served on June 23d and 24th on these officers by leaving them (the notices) "at the office of the Spring Valley Water Works, at its principal place of business in the City and County of San Francisco." It also appears from the record that a notice addressed "to the Spring Valley Water Works Company, Charles Webb Howard, President, and William Norris, Secretary," was served on the twenty-fourth of June, 1881. This notice bore date the day just named, was entitled "In the matter of the equalization of the assessment of the Spring Valley Water Works Company," and the tenor of it was to inform and notify the Water Works Company that the petition to have the assessment on its franchise raised, then on file with the Board of Equalization, would be taken up and acted on by the board at its chambers at the New City Hall, on Saturday, June 25, 1881, at ten o'clock A. M., and it was thereby cited to appear and then and there show cause why the petition referred to should not be granted. This notice issued by an order of the Board made on the twenty-fourth of June, 1881, and was served on the same day by leaving it at the office of the Company as stated with regard to the notice first mentioned. On the twenty-fourth of June, 1881, the Board took up the application to increase the valuation of the franchise of the Spring Valley Water

| | |
| --- | --- |
| 62 | 69 |
| 82 | 216 |
| 82 | 217 |
| 62 | 69 |
| 92 | 614 |
| 62 | 69 |
| 97 | 325 |
| 62 | 69 |
| 99 | 38 |
| 62 | 69 |
| 104 | 164 |
| 62 | 69 |
| 123 | 60 |
| 62 | 69 |
| 124 | 432 |
| 62 | 69 |
| 142 | 279 |
| 142 | 284 |
| e142 | 285 |
| e142 | 287 |
| 142 | 288 |
| 62 | 69 |
| j148 | 326 |
| 62 | 69 |
| 149 | 538 |
| 149 | 589 |
| 149 | 590 |
| f149 | 592 |

Works. Charles N. Fox Esq., attorney, then appeared and protested on behalf of the Spring Valley Water Works against a consideration of the application made in reference to said Water Works at that time for want of jurisdiction on the part of the Board, inasmuch as the Board had adopted no rule prescribing the form and manner of notice, and therefore any further action by the Board would be in violation of law, and that sufficient time was not allowed the Spring Valley Water Works as contemplated by law to prepare and present its case. He (Fox) stated that a notice had been served upon the Secretary of the Company on the afternoon of the preceding day, at four o'clock, just at the time of the closing of the office, to appear before the Board this morning. Afterwards, on the same day, Mr. Fox reiterated his objections to the Board's proceeding, and stated that the President of the Company was out of town when the notice was served on the Secretary, and the notice to the President to appear was not received by him until this morning—meaning the morning of the 24th. The Board determined the question of jurisdiction adversely to the contention of Mr. Fox. He (Fox), then requested that the hearing of the case be postponed until the next day (Saturday) or the Monday following, so as to give the Company an opportunity for preparation and consultation. A like request for postponement on behalf of the San Francisco Gas Light Company was also made (the cases of these two companies were heard together), and on motion, further action in the cases of the Spring Valley Water Works and the San Francisco Gas Light Company was postponed until the forenoon of the next day, Saturday, twenty-fifth of June, at ten o'clock. On the next day (twenty-fifth of June) at the request of R. P. Clement, Esq., who appeared on behalf of the San Francisco Gas Light Company (the case of the Company last named being heard with that of the Spring Valley Water Works), and requested a further postponement of the cases of both companies until two o'clock on that day, for the purpose of allowing the respective counsel to have a consultation with the officers of the companies as to these cases. The cases of the above mentioned companies were afterwards on same day taken up for hearing, when the attorneys were called on to make an admission as to the value of the stock of the companies mentioned. Thereupon Mr. Fox stated that on yesterday he agreed, if ever the case reached that point, that he would admit that the market value of the stock (referring to the Spring Valley Water Works stock) on the seventh day of March, 1881, was par, reserving the right to object to its relevancy, but that on reflection he declined to appear for the Water Company further than to make the point made at the preceding meeting, to the jurisdiction of the Board for want of notice to the Company, and to repeat that no notice had been yet given the Company. After this the Board proceeded to act upon the case of the Spring Valley Water Works, and raised the assessment.

*Held:* 1. That Section 3681 of Political Code providing for the giving of notice by the Clerk of the County Board of Equalization in certain cases, has no application to this case.

2. The appearance of the company on the notices served, waived all objections to the mere form of the notice.

3. The reasonableness of the time given by the notice to show cause in

cases where the law prescribes no definite time, must in a great measure be left to the discretion of the Board.

4. The notice under all the circumstances in this case was not as to time unreasonable.

FRANCHISES DEFINED—FRANCHISE OF SPRING VALLEY WATER WORKS.— The Spring Valley Water Works was a corporation prior to the seventh day of March, 1881, organized and existing under the laws of this State, having its principal place of business and doing business in the city and county of San Francisco. All corporations organized under the laws of this State, are, by the general law, vested with certain powers by express grant. They are invested with further powers by the particular act under which they are incorporated, or by the title of the code under which they are incorporated, or by the title of the code under which they are formed. The Spring Valley Water Works is a corporation formed and doing business under an Act passed April 14, 1853, for the formation of corporations for business and commercial purposes, and an Act passed April 22, 1858, entitled "An Act for the incorporation of water companies." Under the laws of the State this corporation has power to have succession by its corporate name for a period of time (which must not exceed fifty years), to sue or be sued in any Court, to make and use a common seal and alter the same at pleasure, to hold, purchase, and convey such real and personal estate as the purposes of the corporation shall require, to appoint such subordinate officers and agents as the business may require, to make by-laws, not inconsistent with any existing law, for the management of its property, the regulation of its affairs, and the transfer of its stock, as well as all power necessary to the exercise of the expressly granted powers. It has also the power under the Act of 1658, to purchase or to appropriate and take possession of, and to use and hold, all such lands and waters as may be required for the purposes of the company, upon making compensation therefor. This last power enables the corporation to purchase the land and waters required for its business against the will of the owner, by availing itself of the provisions of the laws for the condemnation of land; in other words, to acquire such lands by the exercise of the power of eminent domain. It has the right also under the Act of 1858, subject to the reasonable direction of the Board of Supervisors, to use so much of the streets, ways, and alleys of the City of San Francisco, as may be necessary for laying pipes for conducting water into the city, or any part of it, and also the right to furnish water to the inhabitants of the City and County of San Francisco, and, as this court has recently determined, to the city also. The water so furnished is to be paid for at rates to be fixed each year in a mode established by law. A further power or right inhering in this company by the laws of the State, was the power or right to divide its capital stock into a number of shares which are personal estate, each share representing a minute fractional part of such stock, and each share capable of ownership, of being sold and bought and transferred by a simple process, of passing by will, or to one's heirs after his death through the medium of an administration, and each share securing to the owner a right to participate in the profits and property of the company. The before mentioned powers, or privileges, were supplemented by further grant, which inured to the advantage of

the petitioner, which will be found in the third section of the Act of 1858, by which all the privileges, immunities, and franchises that might be thereafter granted to any individual, or corporation, relating to the introduction of fresh water into the City and County of San Francisco, or into any city or town in this State for the use of the inhabitants thereof, were also granted to all companies incorporated before or after the passage of that Act.

*Held:* 1. Franchises are special privileges conferred by Government on individuals and which do not belong to the citizens of the country generally by common right.

2. The common right refers to the right of citizens generally at common law. Such rights of citizens, though frequently spoken of as franchises, are not the franchises here meant; and it may be conceded that where such rights are granted to corporations, they are not franchises. But independent of the right to exist as a corporation and to exercise powers in its corporate capacity, there are privileges granted to the Water Works, which do not by the common law, belong to citizens generally; such as the right to lay down pipes in the streets, ways, and alleys of a city, and to collect rates for water furnished. Conceding that the Constitution by Section 19 of Article xi. grants this right to every person, it does not follow that it is not a franchise. They are vested by a grant of the sovereign power and not by the common law; and the generality of the grant does not deprive them of the character of franchises.

3. The right to collect rates for use of water supplied to the City and County of San Francisco or the inhabitants thereof which the appellant has possessed at least ever since the Act of 1858 went into effect, is expressly declared to be a franchise by the Constitution of the State in the second Section of Article xiv. thereof.

4. The very existence of a corporation as such, is a franchise, and it exercises its franchise in every act which it performs as a corporation. A corporation, whose existence is a franchise, may possess powers and privileges, which, in themselves, are not franchises; but it usually owns along with such privileges some that are franchises; but whether the powers be entirely of the kind which are franchises or not, its existence and right to employ its corporate powers is a franchise.

FRANCHISES TO BE TAXED.—It was the intention of those who framed and ratified the Constitution to place such franchises in the category of property to be taxed. The word *"franchises,"* as used in the first section of Article xiii., is used generally without any qualifying words, and is intended to embrace all franchises of the character above referred to, whether vested in individuals or bodies politic.

ID.—CONSTRUCTION OF CONSTITUTION.—The clause "and all other matters and things real, personal and mixed, capable of private ownership" in Section 1 of Article xiii., does not qualify the word "franchises," which preceded it. The words used show clearly that they were intended to add something to what preceded them, to refer to kinds of property not previously mentioned, not to qualify anything. They constituted a declaration that in enumerating the property to be taxed it was not intended to confine the enumeration to "moneys, credits, bonds, stocks, dues, franchises," but to include all other kinds of property, and that by no

construction of the word property, as used in the section, were any kinds of property to be left out.

ID.—FRANCHISES ARE PROPERTY.—All these rights exist until the legislative authority has acted so as to impair them or take them away; and until such legislation is enacted, the rights of property remain unimpaired. Shares of stock, whether real or personal estate, are property.

CHARTER OF CORPORATIONS.—In this State, the charter is the statute or statutes granting and defining the powers of the corporation, under which it is constituted and exists, together with the instruments required to be executed by the provisions of such statute or statutes. These are sometimes called the constating instruments. Such franchises are legal estates, not mere naked powers, and are powers coupled with an interest, which vest in the corporation by virtue of its charter or constating instruments.

POWER OF STATE TO TAX FRANCHISE.—There can be no doubt of the power of a State to tax the franchise at its assessed value. There may be more difficulty in arriving at its value than that of a parcel of land or personal chattels, but still its value may be estimated, and such value may exceed the value of the tangible property of the corporation.

ID.—MODE OF TAXATION.—In this State, the Constitution having declared that franchises are property, and that all property in the State not exempt from taxation shall be assessed in proportion to its value, to be ascertained as provided by law (Const., Art. xiii., Sec. 1), it would seem to follow that the tax must be according to a valuation made by the officer appointed for that purpose. If the State can impose a tax on the franchise of a corporation in the nature of an excise or duty, it does not exclude the taxation by a valuation made by an Assessor.

ID.—CASES APPROVED.—The cases of *Burke* v. *Badlam,* 57 Cal. 594; and *San José Gas Co.* v. *January,* id. 614, cited with approval.

POWER OF BOARD TO EQUALIZE ASSESSMENT OF FRANCHISE.—By the several provisions of the Political Code, the power to act on each and every assessment is conferred on the board, and to increase or lower it so as to make it conform to the true value in money of the property mentioned therein, and the Board has full power to act on the assessment of the franchise and increase or lower it as provided in Section 3673, Penal Code.

MODE OF EQUALIZING ASSESSMENT OF FRANCHISE APPROVED.—In this case the Board of Supervisors, in the exercise of its power of equalization, assessed the franchise of the Water Works by taking the aggregate of the market value of the shares of stock in the company on the seventh of March, 1881, and deducting therefrom the value of the real and personal property of the company, and held the difference to be the value of the franchise. The market value of the shares was shown to the Board by the testimony of *witnesses.*

*Held:* This mode of arriving at the value of the franchise, is within the power vested in the Board of Supervisors, acting as a Board of Equalization.

INTENT OF LEGISLATURE TO REQUIRE TAXATION OF FRANCHISES SHOWN.— On the same day on which the Legislature enacted § 3608 of the Political Code, declaring that shares of stock in corporations possess no intrinsic value over and above the actual value of the property of the corpo-

ration which they represent, and prohibiting the taxation of such shares of stock, it repealed § 3640 of the same Code which required the assessment to every person owning, or having the control thereof, of all shares of stock in corporations, and provided that in the case of stock in any corporation having its principal place of business in this State, the assessable value of each share should be ascertained by taking from the market value of its entire capital stock, the value of all property assessed to the corporation, and dividing the remainder by the entire number of shares into which the capital stock was divided.

*Held:* By this section which was repealed, the whole property of the corporation, including franchise and other assessed property, would have been taxed by taxing the shares to each owner of shares in the manner indicated by its provisions. But by declaring, in Section 3608, that shares of stock were not to be taxed because they possessed no intrinsic value over and above the value of the property of the corporation which they stand for and represent, and as taxing of the shares and property both, would be double taxation, and therefore the shares should not be assessed, but the property should, no doubt it was their intention to tax everything in the shape of property owned by the corporation; that everything entering into and giving value to the shares, should be taxed. It can not be doubted that the Legislature in acting on the subject of revenue and taxation during the session of 1881, did not intend to leave the system in relation to so important a matter in such a shape, that so large an amount of property as indicated by the difference between the market value of the shares of corporations and the value of the tangible property of such corporations, should escape taxation. To come to any other conclusion, would be to impute to that body a most culpable dereliction of duty.

GOOD-WILL NO ELEMENT OF VALUE OF STOCK.—Good-will does not enter into or form an element in the value of the shares of stock in a trading corporation.

JURISDICTION OF BOARD IN THIS CASE.—The Board of Supervisors in its capacity of a Board of Equalization, had jurisdiction of the person and subject-matter in the matters involved in this cause.

APPEAL by plaintiff from the judgment of the Superior Court of the City and County of San Francisco. ALLEN, J.

Application for writ of review. The facts are stated in the opinion of the Court. After the decision, a petition for rehearing was presented by the plaintiff. Similar petitions were also presented by the Nevada Bank of San Francisco, The Pacific Coast Steamship Company, and the Bank of California, as being parties interested in the questions involved though not parties to the action. All of the petitions were denied.

*Fox & Kellogg,* for Appellant.

The Board of Equalization had no jurisdiction to raise this

assessment. Because the Board had never by rule prescribed any manner of giving notice of intention to increase the assessment, as provided by law. (Political Code, § 3673.) Because notice of such intention was not given as required by law. (Political Code, §§ 3673 and 3681; *Patten* v. *Green,* 13 Cal. 325; *People* v. *Reynolds,* 28 id. 112.) There was no evidence before the Board of Equalization as to the value of the property described in the assessment upon which it acted, and in the absence of such evidence it had no power to increase the assessment. (*People* v. *Reynolds,* 28 Cal. 107.)

The company had no "property" liable to assessment, of the character of that upon which this increased valuation was placed. This increase of valuation was placed upon "franchise" or "franchises." Whether the company had any franchise or franchises which constituted property, or not, was a fact which must be determined from an examination of the statutes of the State, as every franchise is the creature of statute, and can be held or enjoyed only by virtue of legislative grant.

It is not pretended that the appellant does not possess one or more franchises, in the broad sense of that term, for in that broad sense, the term "franchise" embraces every privilege, the right to enjoy which depends upon permission of the sovereign, or the mode of exercising which is prescribed or regulated by law. In this broad sense the term is synonymous with the word "liberty," and signifies a royal privilege, or a privilege granted by the government. (2 Blackstone's Com. 37.)

It may be a privilege granted to one, to many, or to all; but to be a subject of taxation in this State, and therefore liable to assessment at any sum whatever, it must be a franchise or privilege, "capable of private ownership," and therefore not common to all. "All property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law. The word 'property,' as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership," etc. (Const. Art. xiii, § 1.) Ex-

actly the same definition of the term "property" is found in the Revenue Act. (See Political Code, § 3617, Sub. 1.)

In making up the assessment, the revenue officers seem to have taken it for granted that because franchises may be property, they are *ex necessitate* liable to assessment, and to have overlooked the provision of the Constitution and the statute, that they can only be property, and subject to taxation, when "capable of private ownership." According to their theory, the elective franchise, the freedom of speech, the freedom of the press, the most valuable of all franchises, are liable to assessment and subject to taxation. But these, and a hundred other franchises, are not "capable of private ownership," and therefore not "property," and not being property, are not subject to taxation.

We submit that nothing but "property" is subject to assessment and taxation, in the form now under consideration, under the Constitution or laws of this State. Only those "franchises" can be classed as "property  *  *  capable of private ownership," which are defined by the Supreme Court of the United States, in *Bank of Augusta* v. *Earle*, 13 Pet. 519, as being "special privileges conferred by government on individuals, which do not belong to the citizens of the country generally, or by common right." Wherever we find a franchise held to be property, we find it to be of the class thus clearly defined by the highest tribunal in the land. Of these are street railroads, turnpike roads, bridges, ferries, wharves, and the like.

But the appellant in this case possesses no such franchise. There is no right or privilege which it can name, or upon which it can place its hand and say, "This is mine;" none that is or can be held by it in "private ownership." It owns no franchise; it simply enjoys the privileges conferred by law. Its privileges are these and these only: 1. The right of corporate existence. This is a privilege granted by the Legislature to all the people of the State, and any five of its inhabitants may enjoy that franchise at any time, when they see fit to incorporate for any purpose for which men may contract or associate themselves together. (Civil Code, § 286.) 2. The right to acquire property, when it is absolutely necessary, and can not otherwise be acquired for certain of its corporate uses,

by condemnation. This is a right which can never be exercised without enormous cost, proportioned to the value of the thing acquired, and which is not, and can not be, held in private ownership. It is a right held in common by all corporations organized for the purpose of supplying cities and towns with water as well as many others, and there is no limit to the number of corporations which may organize and actually engage in the business of supplying the same city or town. (See Statute, 1858, p. 218; Code of Civil Procedure, § 1237.) 3. The right to lay and maintain pipes in the streets and to collect water rates. Like the two preceding, so of this. It is not a right which is or can be held "in private ownership." By the statute of 1858, above cited, and under which the appellant is organized, it is a right guaranteed to every corporation organized for the purpose of supplying water in cities and towns, with no limitation upon the number that may engage in the same business in the same city or town. By the Codes the same right is also guaranteed to any corporation organized for such purpose; but under them it could only be exercised when thereunto authorized by ordinance of the city. But by the same section of the Code the city authorities were prohibited from granting any exclusive privilege of the kind. (See Civil Code, §§ 548, 549.)

But since the passage of both the Statute and the Code, the people, in the majesty of their power, have taken away even the limitations of those laws, by which the right to exercise the privilege was limited to corporations, and now it is a right common to every person in the State whether incorporated or not.

By Sec. 19, Art. ii. of the Constitution, it is provided: "In any city where there are no public works owned and controlled by the municipality, for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose, under and by authority of the laws of this State, shall, under the direction of the Superintendent of Streets, or other official in control thereof, and under such general regulations as the municipality may prescribe for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connec-

tions therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gas light, or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof."

Thus it will be seen that under the Constitution of the State it is impossible that there should be a franchise of this kind—that is "capable of private ownership." It is one which belongs to everybody, and whoever sees fit to use it need not even say to the municipal authorities, "by your leave." All they have to do is to be subject to general regulations for damages and indemnity for damages, and to supervision of the Street Superintendent, as to the mode and manner of using the street. It is true that Art. xiv. of the Constitution declares the right to collect water rates to be a franchise which can only be exercised by authority and in the manner prescribed by law. But that does not militate against the proposition that is a privilege common to all, and not "capable of private ownership." It is declared to be a franchise solely for the purpose of making it subject to regulation by law, and without giving it the character of property or private ownership.

These are all the franchises, if they can be called such, enjoyed by the appellant. They are all franchises which are enjoyed by every inhabitant of the State, which are not "capable of private ownership," and therefore not liable to assessment under the law.

The right to lay pipes in the streets is a privilege which can not be granted by the State, free from municipal regulation. The streets of the city are not subject to the control of the State. (*People* v. *Lynch*, 51 Cal. 15.)

A franchise must be by grant of the sovereign to the subject, or be held by that prescription which presumes a grant. It must be in relation to a subject over which the sovereign has control. If it be a matter over which the municipality has control, it ceases to be a franchise, and becomes only a license, for a municipal body has no power to confer a franchise. It lacks the element of sovereignty. (*Davis* v. *The Mayor*, 4 Kernan (14 N. Y.), 506.)

The Legislature of Illinois granted to the Chicago City Railway Company the right to lay and maintain tracks and run cars thereon in such of the streets of the City of Chicago as should be designated by the municipal authorities. This was held not to be a franchise, but a mere license—that it did not come within any definition of a franchise. (*C. C. R. W. Co.* v. *The People*, 73 Ill. 548.)

The right to distribute or sell water is certainly not a franchise. Water has always been distributed and sold in this city by divers methods, and the right of any man to do it has never been questioned. The defendant is not engaged in the collection of tolls for the use of its property, but its business is to procure, store up, and sell water. Its water is a commodity, an article of merchandise, and it has the same right to sell it as any other person engaged in trade or commerce. So held in regard to the identical business in which this defendant is engaged. (*Heyneman* v. *Blake*, 19 Cal. 595.) We therefore respectfully submit that there was, in the item upon which the Board acted, no property subject to assessment, or to increase of valuation.

*F. G. Newlands*, for Appellant.

Had the Board of Supervisors jurisdiction of the subject-matter; or, in other words, are the rights and privileges enjoyed by the Spring Valley Water Works under the Constitution and the general law of its incorporation and the acts amendatory thereof and supplementary thereto, "franchises," within the meaning of Article xiii of the Constitution, and as such "property" subject to taxation, and, if so, has the law provided the mode of ascertaining their value ?

The term " franchise," in its broad sense, means " exemption from constraint or oppression; liberty; freedom" (Webster). In this sense the right to vote is termed a " franchise;" so also the right of trial by jury, freedom of speech, and freedom of the press are termed " franchises." The declaration of the Constitution that the word " property" includes " franchises," certainly was not intended to apply to those general privileges and rights which society has guaranteed and secured to individuals. The " franchises" declared by the Constitution to be property, must be those special privileges, exclusive in

their nature, conferred by the Government on individuals, and having the incidents and attributes of property; that is to say, they must be capable of private ownership, of assignment, and of being inherited. In this sense they are included in that division of property called "incorporeal hereditaments;" they are things without body, capable of being inherited, such as the right of "ferry," or the right of "fishery," or the right to maintain a "toll" road, conferred upon the grantee, his heirs or assigns. It is evidently in this sense, that the word is used in the Constitution, for in it the word "property" is declared to include "moneys, credits, * * * franchises, and all other matters and things real, personal, and mixed, capable of private ownership." The last words attach to and qualify all the taxable things referred to in the above quotation. Those franchises only which are "capable of private ownership" are to be assessed and taxed. If this is not so, then the Assessor must assess to each individual, and value the right to vote, the right of trial by jury, the rights of freedom of speech and of the press, and all other franchises and privileges which, in the struggle of the ages, have been secured to individuals by constitutional or legislative enactment. None of these are natural rights. It may be doubted whether man, considered as a member of society, has any natural rights; he has only those rights which society gives or permits him to enjoy; he has not the right to live, or to freely utter his sentiments, or to vote, or to be tried by his peers, save so far as society has conferred or allowed him to enjoy the right. He lives, moves, and acts with the consent or by sufferance of society. So that in this sense no man exercises or enjoys any rights or privileges which are not either the free gift of the sovereign power or the result of its unwillingness to restrain, whether that power be, as in Russia, a despotic Czar, or as in England, the Crown and Parliament, or as in America, a sovereign people acting through the Constitution which contains their fixed and permanent will, or through the Legislature which, as their representative, deals with the matter subjected to its discretion. Obviously the taxing power was not intended to be applied to such rights and privileges.

Assuming, then, that the word "franchises," as used in the

Constitution, was not intended to be applied to those rights which are conferred by the Government upon individuals generally, and which are made by the Government of common rights and general enjoyment, but that it applies only to those rights and privileges exclusive in their nature, which are conferred by the Government upon individuals or corporations, which are capable of private ownership, which are subject to the dominion of the owners, which can be sold or given away or devised by them, and which come within the full meaning of the term "incorporeal hereditaments," the question arises as to whether or not the Spring Valley Water Works owns any "franchises" of the latter class. The Supreme Court of this State (*San Francisco v. S. V. W. W.*, 48 Cal. 531) say: "We are to ascertain the rights, privileges, powers, duties, and obligations of the Spring Valley Water Company by reference only to the general law under which it was incorporated," and also "the Legislature can neither pass a special Act granting powers or privileges to a particular corporation created under the general law which are not enjoyed by all other like corporations under the same law, nor pass a special Act limiting, or burdening with peculiar conditions, the rights or powers acquired by a particular corporation from the general law." That case overruled the case of *California State Telegraph Company v. The Alta Telegraph Co.*, 22 Cal. 398, and in effect held that the Spring Valley Water Works could not become the grantee either directly or indirectly, either by direct grant or by the assignment to it of a grant already made, of any exclusive or special privileges conferred by the Government, and which could not be exercised without a grant from the Government. This Court will take judicial notice of the Constitution and of the general laws under which the petitioner was incorporated, and inasmuch as it has declared that Water Companies have not the capacity to acquire any rights or privileges from the Government save such as are contained in the Constitution and the general laws, no presumption will be indulged as to the ownership by the petitioner of any "franchises" or privileges conferred by the sovereign other than those contained therein.

The Constitution of 1863 declared (Art. iv., § 31): "Corporations may be formed under general laws, but shall not be

CAL. REPS. LXII—6

created by special act except for municipal purposes; all general laws and special acts passed pursuant to this section may be altered from time to time or repealed." The general laws under which the petitioner was incorporated, are an Act passed April 14, 1853, for the formation of corporations for business and commercial purposes; and an Act passed April 22, 1858, entitled "An Act for the Incorporation of Water Companies." Under these Acts, the petitioner has the following rights and privileges:

1. The right to be a corporation—that is to say, the right as an artificial being, to act under an artificial name, and to exercise certain powers and duties of a natural person, among others, to sue and be sued, and to purchase, hold, sell, and convey real and personal property. Under the Act of 1853, any three or more persons could associate themselves together and form a water company, by signing and filing the proper certificate. This was a privilege made by the laws of common right and general enjoyment. All persons could exercise it. Under the Civil Code, § 286, "Private corporations may be formed for any purpose for which individuals may lawfully associate themselves," and any five persons may associate themselves together and form such corporation. It appears, then, that the right to be a corporation, is simply a privilege conferred by the general law upon any number of persons, not less than three in the one case, or five in the other, whoever they may be, who may wish to associate themselves together, to exercise, as an associated body, under an artificial name, certain powers, and perform certain duties of a natural person. In other words, a corporation is a bundle of faculties. Could the faculty of a natural person to sue and be sued, or his faculty to acquire and possess property, be assessed as property? The right to the things sued for, which constitute choses in action, or the property acquired and possessed, could be assessed both to natural and artificial beings, but not mere faculties or powers. The right to be a corporation is simply the right to exist at the will of the creator. Can the right to exist, either as a natural or artificial being, be valued as property?

2. Under the Act of 1858, water companies are granted the privilege of exercising the power of eminent domain; but they

exercise this privilege simply as the agents of the State, for the purpose of serving a public use, to which their powers and property are delegated. This agency may be revoked at any time. It is a naked power—not a power coupled with an interest. Can the agency of the agent, whether natural or artificial, be assessed as property? Besides, this agency is not conferred on water companies alone, but upon every corporation or individual in charge of a public use. (C. C. P., §§ 1237 and 1263.) So that the right of exercising the right of eminent domain, for the purpose of supplying the city with water, has been made, by general laws, a matter of common right and universal enjoyment. This privilege of exercising the right of eminent domain is not property owned; the corporation exercising the privilege, can not assign it. "The State determines certain uses to be public, and then, since the State must act through agents, delegates the task of ascertaining what particular property is necessary to a use, and what is just compensation to a private proprietor. * * * The supplying of water to the inhabitants of a city is a public use. * * * But in the proceedings provided by law for the ascertainment of the property necessary for this use, and its value, the corporation takes no part, other than to initiate them. * * * A water company, having commenced such proceedings, can not sell and transfer its right to prosecute them, or to take private property to another water company, nor can the latter purchase such right." (*Mahoney* v. *S. V. W. W.*, 52 Cal. 159.) All persons, both natural and artificial, who have in charge that use which has been determined by the sovereign power to be a public use, act only as the agents of the sovereign, and have no proprietary right in the privilege of exercising the power of eminent domain.

3. The only other right or privilege conferred by the general law of 1858, upon water companies, is the right of laying down pipes in the streets of the city, and supplying the inhabitants with water at rates fixed by law; but this right is not only common to all water companies, but is also conferred by Art. xi., § 19, and Art. xiv., of the New Constitution, on all individuals, so that this right which, if granted absolutely and exclusively to a single individual or a single corporation, and his or its assigns, might be regarded as property,

has been by the fundamental law of the State made a matter of common right and general enjoyment. It is true that everybody does not exercise this right or privilege, just as everybody does not exercise the right to vote, but everybody has the right to exercise it, and it is even more unlimited and general than the right to vote, for the latter right is conferred only upon native-born inhabitants over twenty-one years of age and upon naturalized citizens, whilst the former right can be exercised by anybody; whether adult or minor, citizen or alien. This right or privilege has none of the incidents of ownership; no one can sell it, for everybody has it, and no person can gain by the accession of the right of another.

We have thus classified all the rights and privileges of water companies under the general law, and the Constitution of the State, and we find that they are all subject to alteration and entire revocation by the State; they are privileges enjoyed, not property owned. Webster defines property to be: " 4. The exclusive right of possessing, enjoying, and disposing of a thing; ownership; 6. An estate, whether in lands, goods, or money." Blackstone, book 1, page 138, speaks of property as an absolute right " which consists in the free use, enjoyment, and disposal of all his acquisitions without any control or diminution, save only by the laws of the land," and in another place, book 2, page 2, speaks of the right of property as " that sole and despotic dominion which one man claims and exercises over the external things of the world in total exclusion of the right of any other individual in the universe." Bouvier, in his Law Dictionary, in defining the word property, says : " It is the right to enjoy and to dispose of certain things in the most absolute manner, * * * so that property, considered as an exclusive right to things, contains not only a right to use those things, but a right to dispose of them, either by exchanging them for other things, or by giving them away to any other person, without any consideration, or even throwing them away."

Can it be said that any of the rights or privileges conferred on the petitioner by general laws, subject to alteration, amendment or repeal, come within the definition of the term " property "? This Court has already determined (*People* v. *Hibernia Bank*, 51 Cal. 243), that " credits," though admitted to be

property within the above definitions, are not property in the sense in which the word " property " is used in Section 13, Article xi, of the old Constitution ; but these rights and privileges are not " property " in any sense ; the Constitution can not by a mere declaration make that " property " which has none of its attributes ; it can not by a mere declaration make a liquid a solid, or substance spirit, or give a line breadth and thickness as well as length, or measure space with a yard stick—there are some things beyond the power of constitutional enactment.   The constitutional provision will be entirely satisfied by confining the application of the term " franchises " to those grants made by the State already referred to which are " capable of private ownership."

This Court has already substantially determined that the privileges conferred by the general laws of the State are not property.   In a recent case (*S. V. W. W* v. *Schottler et al.*), the petitioner, claiming the right, under the Act of 1858, to an equal voice in the fixing of water rates, sued out a writ of mandate to compel the Board of Supervisors to fill a vacancy in the Board of Commissioners provided by that Act.   The defense was that the new Constitution had changed the mode of fixing water rates and had vested the power in the Board of Supervisors, most of them consumers of water themselves, and all of them the political representatives of the domestic consumers and the agents of the city and county—the largest consumers of water.   It was claimed on behalf of petitioner that the Act of 1858 was a contract, and that it had vested rights and property in the privileges thereby conferred; that among such was the right to have its rates fixed by a Board of Commissioners, two to be appointed by the Board of Supervisors and two by the company; that the new Constitution, if applicable to petitioner, was in contravention of the Federal Constitution in that it violated the obligation of a contract and deprived petitioner of its property (vested rights) without due process of law.   The Supreme Court, in effect, determined that the Act of 1858 was not a contract and that the rights and privileges conferred by that Act were not "property." It follows, then, logically, that if these rights and privileges are not property within the meaning of the Federal Constitution, they can not be property within the meaning of the

State Constitution. It can not be contended that the term "property," as found in the State Constitution, is used in a broader sense than in the Federal, for the term is used in the latter, according to all the adjudged cases; in the broadest sense of which it is capable.

Under the old Constitution, it was possible to grant a franchise, in the property sense of that term, to any natural person. Such grants were made, are now in existence, and may be taxed as property. But no such franchise could, under the old Constitution, be granted to a corporation; for the Supreme Court, in construing the provision of the Constitution with reference to corporations, in *San Francisco* v. *S. V. W. W.*, *supra*, in effect determined, not only that a corporation must be created under the general laws, but also that no special privilege or franchise can be granted to it after its creation, and that it can not acquire, even by assignment, any privilege, the nature of which is such that it can not be exercised without a grant from the Legislature.

Under the new Constitution it is impossible to grant a franchise, in the property sense of that term, to either natural or artificial persons, for it declares (Art. i., § 21): "No special privilege or immunities shall be granted which may not be altered, revoked, or repealed by the Legislature. Nor shall any class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens." And again, (Art. iv., § 25): "The Legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: Granting to any corporation, association, or individual any exclusive right, privilege, or immunity—in all cases where a general law may be made applicable."

It is evident, therefore, that the day of "franchises" as "property" is over. The whole tendency of the civilized government is to do away with special or exclusive privileges, and wherever a right is extended by the Government to make it common to all. Equality of right, equality of privilege, and equality of burden, are now the crowning franchises of all persons, natural and artificial, in this State. The great difficulty in construing a word like "franchise," which has figured extensively in the evolution of government, is that the attributes of a by-gone age are likely to be given to it not-

withstanding the modifications that may have taken place in
its character and scope.    As already stated the power of so-
ciety over the individual is absolute.    It is called the power
of government, or the police power.    Every privilege which
the individual, either specially, or as a member of a class or
in common with all other individuals, enjoys, may be regarded
in one sense as a grant from the Government.    The despot
who rules with the consent or by the sufferance of society has
absolute power over the vocation of life.    He can grant to a
certain individual the right to pursue a special trade exclu-
sively, or he can throw open such trade or occupation to all.
When such a grant is made to an individual, his heirs and
assigns, it may be regarded as his property; and when such a
grant is made to all individuals it is no less a franchise; it is .
a freedom, a liberty, but not "property."    If we look back to
the times of Elizabeth, James the First, and Charles the First,
we will find many examples of special grants which partook
of the nature of property.    Hallam, in his Constitutional His-
tory of England, vol. i, chap. v, speaking of the reign of
Elizabeth, says: "The crown either possessed or assumed the
prerogative of regulating almost all matters of commerce at
its discretion."

"Patents to deal exclusively in particular articles, generally
of foreign growth, but reaching in some instances to such im-
portant necessaries of life as salt, leather, and coal, had been
lavishly granted to the courtiers with little direct advantage
to the revenue.    They sold them to companies of merchants,
who of course enhanced the price to the utmost ability of the
purchaser."

"In 1601 Parliament made a bolder and more successful attack
on the administration than this reign had witnessed.  The griev-
ance of monopolies had gone on continually increasing; scarce
any article was exempt from these oppressive patents.    When
the list of them was read over in the House a member ex-
claimed: 'Is not bread among the number?'    The House
seemed amazed: 'Nay,' said he, 'if no remedy is found for
these, bread will be there before the next Parliament.'"

It was in those times that the East India Company was or-
ganized under letters patent from the crown, and vested with
the exclusive right to trade in India.    Monopolies were granted

by letters patent, conferring the exclusive right to deal in necessaries of life, such as coal, iron, soap, salt, leather, tobacco, beer, hops, linen, etc. (Bright's English Hist., vol. ii. page 629.) Rights of ferry, rights of wharfage, rights of fishing, rights of chase and of toll-roads, etc., were also granted. All these grants, as a rule, were made by letters patent, running to an individual, his heirs or assigns, and exclusive in their nature. They were protected by the courts as property, and it was held by the courts that no grant could be made by the sovereign which would interfere with or impair the exercise of the previous grant. They were therefore termed incorporeal hereditaments, and Kent, in speaking of such franchises, says (Kent's Com., vol. 3, page 458): "Another class of incorporeal hereditaments are franchises, being certain privileges conferred by grant from government, and vested in individuals. In England they are very numerous and are understood to be royal privileges in the hands of a subject. They contain an implied covenant on the part of the Government not to invade the rights vested. * * * The Government can not resume them at pleasure or do any act to impair the grant without a breach of contract. * * * An estate in such a franchise and an estate in law rest upon the same principle, being equally grants of a right or privilege for an adequate consideration. If the creation of a franchise be not declared to be exclusive, yet it is necessarily implied in the grant, as in the case of the grant of the ferry, bridge, or turnpike, or railroad, that the Government will not, either directly or indirectly, interfere with it so as to destroy or materially impair its value. Every such interference, whether it be by the creation of a rival franchise or otherwise, would be in violation or in fraud of the grant."

Such was the nature of franchises in England and also in this country at the time Chancellor Kent wrote. In the celebrated case of *Dartmouth College* v. *Woodward,* 4 Wheaton, 519, it was decided that the charter granted by the British Crown to Dartmouth College was a contract, and that an Act of the Legislature of New Hampshire altering the charter was an act impairing the obligation of a contract, and was unconstitutional and void. Justice Washington said (page 657):

"To this grant or this franchise the parties are the king and the person for whose benefit it is created or trustees for them. The assent of both is necessary. The subjects of the grant are not only privileges and immunities, but property. * * * Certain obligations are created binding both on the grantor and the grantee. On the part of the former, it amounts to an extinguishment of the king's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant. It implies, therefore, a contract not to reassert the right to grant the franchise to another, or to impair it."

Justice Story says (p. 700): "In respect to corporate franchises they are, properly speaking, legal estates vested in the corporation itself as soon as it is *en esse*. They are not mere naked powers granted to the corporation, but powers coupled with an interest."

Mr. Webster, in his memorable argument in that case, says: "Hume gives the reason: It is that such franchises were regarded in a most emphatic sense as private property. If it could be made to appear that the trustees and the president and professors held their offices and franchises during the pleasure of the Legislature, and that the property holden belonged to the State, then indeed the Legislature have done no more than they had a right to do. But this is not so. The charter is a charter of privileges and immunities, and these are holden by the trustees expressly against the State for ever."

The decision of this case attracted great attention. Its effect was feared; it placed the creature beyond the power of the creator, and as a result of it the various States adopted constitutional amendments providing for the formation of corporations under general laws, which should be subject to alteration, amendment, or repeal. The Courts themselves in a measure shrank back from the doctrine of that case, and in a subsequent case, argued in the Supreme Court of the United States, entitled *Charles River Bridge* v. *Warren Bridge et al.* (11 Peters, 420), they modified the doctrine which had previously existed as to the exclusiveness of franchises, and declared "that a franchise conferred by the government was not exclusive unless so expressed in the grant." This re-

mained the settled doctrine of the American Courts since that decision. It will be observed, therefore, that the tendency of the people, acting through constitutional conventions and representative Legislatures, and of the Courts, has been to modify the doctrine of the *Dartmouth College Case*, and to make powers conferred by the government upon persons, natural or artificial, mere privileges enjoyed, not property owned. This tendency has reached its highest development in our State, where the Legislature is not permitted to grant any special privilege to any person, natural or artificial, and where all privileges conferred by the sovereign power are made of common right and general enjoyment.

But while the tendency of the constitutional and legislative enactment has been to take away from all the rights and privileges conferred upon corporations the attributes and incidents of property, and to subject them entirely to the control of the sovereign will to be enjoyed only at the pleasure of the sovereign, yet the Courts, in considering these general privileges under the term "franchises" as subject to the taxing power, have sometimes lost sight of the change which has taken place in the character of such franchises, and they refer to the *Dartmouth College Case* as authority upon the proposition that corporate franchises are property, and as such subject to taxation. Thus, in *Society for Savings* v. *Coite* (6 Wall. 594), Justice Clifford says: " Corporate franchises are legal estates vested in the corporation itself as soon as it is *in esse*. They are not mere naked powers granted to the corporation, but powers coupled with an interest, which vest in the corporation upon the possession of its franchises." And he refers as his authority for this proposition to the *Dartmouth College Case* without inquiry as to whether or not the corporation under consideration had a charter resembling that of Dartmouth College, partaking of the nature of a contract, and as such property. And yet, while Justice Clifford in this case and in the two following cases in 6 Wallace, speaks of franchises as valuable, and as partaking of the nature of property, he expressly decides that the taxes in question, if regarded as taxes on property, would be unconstitutional and void, and upholds these taxes as taxes upon franchises and not upon property. He says (page 607):

"Nothing can be more certain in legal decision than that the privileges and franchises of a private corporation, and all trades and avocations by which the citizens acquire a livelihood, may be taxed by a State for the support of the State government."

And in *Provident Institution* v. *Massachusetts*, 6 Wall. 626, he says: "Regarded merely as a question of power, it is undoubtedly true \* \* \* that the Legislature might as well exact a fee or tribute from brokers, factors, or commission merchants for the privilege of transacting their business." And again, page 630 : "Considered as a tax on property, no part of the tax could be supported under the Constitution of the State. And there never was a moment when such a tax, if viewed as a property tax, could be upheld since the State was organized under a written Constitution." And again, page 631: "Franchise taxes are levied directly by an Act of the Legislature, and the corporations are required to pay the amount into the State Treasury. They differ from property taxes as levied for State and municipal purposes in the basis presented for computing the amount, in the manner of assessment, and in the mode of collection. And they are in lieu of all other taxation, State or municipal. Comparative valuation in assessing property taxes is the basis of computation in ascertaining the amount to be contributed by an individual, but the amount of a franchise tax depends upon the business transacted by the corporation, and the extent to which they have exercised the privileges granted in their charter."

It will be observed, therefore, that the taxes referred to in these cases were in the nature of excise or license taxes and were imposed upon the privilege of a corporation to do business, just as they might be, and often are, imposed upon the privilege of an individual to engage in business, or in the practice of a profession.

Examination also has developed the fact which would warrant Mr. Justice Clifford in referring to the *Dartmouth College Case*, for a construction of the nature of the franchises in question, that the Hamilton Company and the Provident Institution, referred to in 6 Wall., were both incorporated under charters containing no reserved power in the State.

(Laws of Mass., 1824, c. 44, p. 227; also Special Laws of Mass., 1816, vol. 5, p. 172.) No general statute was passed in Massachusetts reserving the power to amend or repeal the charter of corporations until 1830. (Rev. Stat. Mass., 1836, c. 44, § 23, p. 366.)

We undertake to say that in no case has it been determined that the privileges conferred upon corporations by general laws subject to alteration, amendment, or repeal, have been determined to be property, where the attention of the Court has been called to the distinction between the charter or franchise of such corporation, and the charter or franchise under consideration in the *Dartmouth-College Case;* but in many such cases without noting the distinction, franchises have been referred to as property upon the authority of the *Dartmouth College Case.*

A review of the cases in which a franchise tax has been sustained, will demonstrate that the tax was not upon the franchise as property, but upon the person of the corporation, measured by its net earnings or income, or surplus profits, or by the extent to which it exercised its franchise, the rate of the tax being fixed by the statute as well as the mode of measuring it, and the tax being in all cases regarded not as a tax on property, but as an excise or license tax, upon the vocation or privilege of doing business, and similar to the taxes which are levied upon different trades, occupations, and professions, such as those of auctioneers, peddlers, merchants, and lawyers. (See 18 Wall. 206; 6 Id. 594, 633, 656; 13 Id. 206; *Portland Bank* v. *Apthorp,* 12 Mass. 252; *Providence Bank* v. *Billings,* 4 Pet. 514; *Gordon* v. *Appeal Tax Court,* 3 How. 150; *Wilmington R. R. Co.* v. *Reed,* 13 Wall. 264; Burroughs on Tax, § 85, p. 169; Constitution of Ill., art. ix., § 1.)

The only case which has been called to our attention in which a tax has been imposed upon the franchise of a corporation as property, separate and apart from the property in connection with which it is exercised, is the case of *Exchange Bank of Columbus* v. *Hines,* 3 Ohio St. 7, in which the Court declared the tax invalid, in the following language: "It is proper here to remark, that it is said to have been determined by high authority, that the franchise of an incor-

porated bank, is the subject-matter of contract, and property
of a clear and distinct character.  If the corporate franchise
of a bank be, in fact, property or effects of any description
whatever, it is made a subject-matter of taxation by the im-
perative language of the Constitution above recited, and
should be placed on the list of assessments for that purpose.
But what is the fact ?  Does a corporate franchise, in sober
truth and reality, possess the essential qualities of property ?
It is said that the corporate franchise of a bank, conferring
a peculiar legal capacity, and the high function of making
and circulating paper money, is valuable—indeed, a thing of
great value.  But value is not the distinguishing attribute
of property.  The right of suffrage is esteemed valuable; a
public office, with its emoluments, is valuable; a license to
keep a tavern, as formerly granted in this State, or a license
to carry on any special business which is prohibited without
a special grant of authority from the Government, may be
valuable; and a right to either of these things may be as-
serted and maintained in a Court of justice, yet neither of
them possesses the essential qualities which constitute prop-
erty.  Our right to the free use and enjoyment of things
which are in common, such as air, light, water, etc., is valu-
able; and our right to the free use of the public highways,
and to many of the privileges and advantages derived from
the Government, may be valuable, and may be maintained
by legal process.  Yet none of these things come within the
denomination of property.  Those things which constitute
the subject-matter of private property are such as the owner
may exercise exclusive dominion over, in the use, enjoyment,
and disposal of them, without any control or diminution, save
only by the laws of the land.  (1 Wend. Blackstone, 138.)  It
is a fundamental principle that property considered as an ex-
clusive right to things contains not only a right to use those
things, but a right to dispose of them, either by exchanging
them for other things, or by giving them away to any other
person, without any valuable consideration in return, or even
of throwing them away, which is usually called relinquish-
ing them."  (*Rutherford's Institutes*, 20 Puffendorff, c. 9, b. 7.)

"It is said that capability of alienation, or disposal, either
by sale, devise, or abandonment, is an essential incident to

property." (2 Kent's Com. 317.) "A corporate franchise, therefore, being a mere privilege, or grant of authority by the Government, is not property of any description, and consequently not subject to taxation under the above provision of the Constitution."

In this connection it may be added that no objection whatever could be urged against a rule of assessment which would take the franchise as an element of the value of the property in connection with which it is used. The value of all property must be considered in association with the uses to which it is put and its adaptability to them. Intrinsically there may be no difference between the value of agricultural land and a lot of equal size in the business center of a large city; but the latter, as a matter of fact, has a greater commercial value, because of the valuable uses to which it is or may be put. So, also, the mains, pipes, and reservoirs of the Spring Valley Water Works have a value above that of mere iron or land, in connection with the uses to which they are put, the privileges granted by the Government, which are exercised, the skill and energy shown in the conduct of the business. The "potentiality" of the corporation may enter as an element into the determination of the value of its property; but certainly the mere privilege of transacting business in a certain way has no money value apart from the property with which it is associated and in connection with which it is exercised. No rule, therefore, can be adopted which regards the "franchise" as a distinct entity, as a unit. That rule only can be made applicable which values the franchise in connection with and as a part of the property with which its exercise is united.

But assuming that the general rights and privileges enjoyed by water companies under the Constitution and general laws are franchises within the meaning of the Constitution, and as such are taxable property, the next question which arises is as to whether the law has prescribed a mode for ascertaining their value; for the Constitution not only provides that "all property shall be taxed in proportion to its value," but that such value is "to be ascertained as provided by law." The only rule laid down in the Political Code for the assessment of property is that contained in section 3637, to wit:

"All taxable property must be assessed at its full cash value," which latter term is defined (§ 3617, subd. 5) as follows: " The terms value and cash value mean the amount at which the property would be taken in payment of a just debt due from a solvent debtor." In other words, the rights and privileges conferred upon the petitioner by the general laws must be assessed at the amount at which they would be taken in payment of a just debt due from a solvent debtor. This rule is no rule at all as applied to this particular class of property if they be such, for they would not be taken in payment of a just debt of the petitioner; the petitioner could not assign or transfer them; the creditor could not take them, for, as already shown, he could not gain anything by their acquisition beyond that which he already has.

In this case the Assessor valued the franchise of the petitioner at five thousand dollars; the Board of Equalization raised the assessment to five million dollars; the proceedings show that the rule adopted by the Board in making this assessment was one which has no countenance whatever from the statute. The rule applied was one which it was declared had the approval of the Supreme Court, in the case of *San José Gas Co.* v. *January,* viz., by ascertaining, first, the market value of the property of the corporation; and secondly, the assessed value of the property thereof; and deducting the latter from the former, the difference was declared to be the value of the franchise. But was this a correct or just rule, assuming that the Board of Equalization had the power to make a rule for themselves? Obviously not; the difference between the value of the tangible property and the aggregate value of the stock of the corporation is composed of various elements, among which may be enumerated the skill, ability, and enterprise with which the business is conducted, the fortunate conditions and circumstances surrounding it, the custom which has been gained by the steady pursuit of the business for a number of years and by a course of judicious and honorable dealing with the public. It would be as wrong to say that this difference represents the value of the franchise, as it would be to say that it represents the value of the skill, or ability, or enterprise employed in the business, or of the fortunate circumstances under which the business is con-

ducted.   True, it might be said that the business of the company could not be conducted at all without the franchise; but so also it might be said that it could not be conducted without iron pipes, or labor, or skill, or energy, or fortunate circumstances.   Each element of the business is as valuable as any other, and it is the union of all the elements which makes the business profitable and which gives to the shares of stock their market value.   So that this rule of assessment not only included the value of the franchise, that is the mere privilege under an artificial name, of exercising the power of a natural person, but also included the valuation of luck, chance, hope, skill, ability, energy, enterprise, and good-will.

The rule applied does not operate equally and uniformly upon all franchises, for in the case of a franchise enjoyed by an individual, there would be no stock from the aggregate market value of which could be deducted the value of the tangible property in order to ascertain the value of the franchise, nor is it an equal or uniform rule in any sense, for it applies only to corporations, whereas the business of private individuals and firms should be subjected to the same mode of assessment.   A mercantile firm may have a stock of goods on hand worth one hundred thousand dollars, and yet its business, the good will, so called, with the advantages which years of skillful and honorable attention to business united with fortunate circumstances may have given, may be worth five times as much as the stock.   And yet the Assessor assesses only the tangible property and lets the good-will go free. The law provides that " private corporations may be formed for any purpose for which individuals may lawfully associate themselves" (C. C., § 286).   Such a mercantile firm could, if it chose, form itself into a mercantile corporation.   With a stock of goods on hand never exceeding one hundred thousand dollars it might earn, with the skill and ability of its members through the large custom acquired, a liberal rate of interest on five hundred thousand dollars, and the stock would sell in the market for that sum.   In such cases the Assessor, pursuing the rule contended for here, would determine the value of the franchise to be four hundred thousand dollars; whereas, as a matter of fact, the right to be a corporation would be utterly valueless to a firm, and the difference between the

market value of the stock and the value of the tangible property would simply be the good-will of the business; this would exist, whether the concern was incorporated or not; and yet the difference is assessed only to corporations and not to individuals.

A more glaring instance of the absurdity of the rule applied, is that of a newspaper whose value is almost entirely made up of skill, ability, enterprise, and good-will. Take the case of the two leading newspapers of this city, the Chronicle and Call, owned by private proprietors. Each is valued at about three hundred thousand dollars, and probably yields its proprietors a liberal interest upon that amount. Probably the only property connected with either of these papers which the Assessor would assess are the printing presses and fixtures, worth say, thirty thousand dollars; but if either paper should be incorporated into a joint stock company, with a capital stock of three hundred thousand dollars, its stock would probably sell for that amount, as the value of the stock in the market is largely determined by the rate of interest paid as dividends upon it. The Assessor then, in that case, would assess the franchise, that is, the privilege of conducting the same business in the name of an artificial being, at the difference between the value of the printing press and fixtures, and the market value of the stock, namely : two hundred and seventy thousand dollars. So the mere change in the conduct of the business of such a newspaper, from the hands of a natural person to those of an artificial person, would result in an assessment upon the latter ten times greater than upon the former, and yet this artificial person is a purely business corporation; it does not have the power of eminent domain, or exercise the royal prerogative of collecting tolls; the only franchise it possesses is the right to be a corporation.

The Civil Code (§ 993) declares: "The good-will of a business is property transferable like any other." It certainly has more of the attributes of property than the general privileges enjoyed by a corporation under general laws, for whilst it is inseparably connected with the business to which it is attached, and perhaps with the name under which and the locality at which it is conducted, yet it can be sold or inherited in association with them. If then all property is to

be taxed, and the general privileges of corporations are property and must be taxed, the "good-will" of every individual and firm doing business in San Francisco must also be taxed. But has the statute laid down any rule whatever for measuring the value of the good will of a business? It simply says that all property shall be taxed at its full cash value, *i. e.*, the amount at which it would be taken by a creditor in payment of a solvent debt. But no person would buy, and no creditor would take the good-will of an establishment disassociated from the place of business and from the stock. If, then, legislative action is required in order to prescribe the mode of assessing the value of the good-will, it is also required for assessing the value of the general privileges of corporations. In both cases it is equally impossible to determine "their full cash value," for this term means the value that would be paid in cash for a transfer of the property. As already shown, the rights and privileges constituting the franchise can not be sold, and if sold would add nothing to the wealth of the buyer. As to the good-will, it can not be sold, and it has no value except in connection with the stock, the place of business, and the name of the individual or firm conducting it.

In the case of *Dewitt* v. *Hays*, 2 Cal. 463, the Court declared the mere right to collect wharfage and dockage for a certain term of years, was neither real estate nor personal property, but a franchise or incorporeal hereditament, an uncertain profit issuing out of the realty, and also that the statute did not prescribe the mode for assessing its value, and until it did so, no assessment of it could be made. It may be said that this case, whilst it demonstrates that the Legislature must prescribe some rule for assessing franchises, yet declares them to be property. An examination of the case, however, will disclose that the rights and privileges under consideration were exclusive in their nature, and ran to the grantees and their assigns. As such they came within the meaning of the term "franchise" in its property sense, as hereinbefore declared. Whilst, then, the assessment of these rights and privileges, if they be property, must be left to the judgment of the Assessor, yet the rule by which the assessment is to be made, can not be left to his discretion or caprice. It must be clearly defined by the statute. It can not be left to him to

determine whether he will adopt the rule that is prescribed by statute in Massachusetts, or Pennsylvania, or Delaware, or Illinois, in each of which States a different rule prevails. Nor can he adopt his own rule; for if this were the case, we should have as many different rules for determining the value of franchises as there are Assessors and Boards of Equalization in the State. The very rule applied in this case can not be applied to all corporations, for it presupposes that the capital stock of a corporation has a market value, whereas we all know that the shares of stock of many mining corporations owning property of great value, are not on the market at all, and it is impossible to ascertain their real value by any market quotations. In the case of the valuation of the good-will of a firm or individual doing business, there would be no shares of stock whose aggregate market value would make an element in the calculation.

Where a defendant appears for the purpose of taking advantage of an irregular summons, by a motion to dismiss, it does not amount to a waiver of his rights so as to cure the defect; nor does he waive his rights by answering and moving to dismiss, and motion overruled. (*Deidesheimer* v. *Brown*, 8 Cal. 339.) A notice given by an attorney on behalf of a defendant, to plaintiff's attorney, that defendant will move before a Court Commissioner, that an attachment issued in the case be dissolved, does not constitute an appearance in the action. (*Glidden* v. *Packard*, 28 id. 649.) A person has the right to appear for the special purpose of moving to dismiss a defective summons. If the Court denies the motion, a general appearance afterwards and an answer does not waive the right or cure the error. (*Lyman* v. *Milton*, 44 id. 631; *Lander* v. *Fleming*, 47 id. 615.)

*John L. Love & W. C. Burnett,* for Respondents.

*McAllister & Bergin,* for The Nevada Bank of San Francisco, and for the Pacific Coast Steamship Company, on petition for rehearing.

*Wilson & Wilson,* for The Bank of California, on petition for rehearing.

Thornton, J.:

This is an appeal from a judgment of the Superior Court of the City and County of San Francisco, denying the application of the Spring Valley Water Works for a writ of review, and confirming the action of the Board of Equalization of the city and county above named. The writ was sued out to review the action of the Board of Equalization in raising the assessment of the franchise of the Water Works above named from five thousand dollars to five million dollars, and to have it vacated and set aside as being in excess of the jurisdiction of the Board.

It is contended, on behalf of the appellant, that no notice, as required by law, was given to the Water Works, inasmuch as it was not given in accordance with a rule prescribed in advance by the Board. This Court has recently decided that these rules are no part of the record and proceedings to be brought up on *certiorari.* (*Garretson* v. *Supervisors,* 9 Pac. C. L. J. 685.) This point will not, therefore, be further considered.

The next point relates to the service of notice. The transcript shows that notices to appear and show cause before the Board of Supervisors, at their chambers in the City Hall, on Friday, June 24, at ten o'clock A. M., why the assessment of the Spring Valley Water Works should not be raised to fourteen million dollars, addressed to the President and Secretary of the Spring Valley Water Works, were served on June twenty-third and twenty-fourth on these officers, by leaving them (the notices) "at the office of the Spring Valley Water Works, at its principal place of business in the City and County of San Francisco." It also appears from the record that a notice addressed "to the Spring Valley Water Works Company, Charles Webb Howard, President, and William Norris, Secretary," was served on the twenty-fourth of June, 1881. This notice bore date the day just named, was entitled "In the matter of the equalization of the assessment of the Spring Valley Water Works Company," and the tenor of it was to inform and notify the Water Works Company that the petition to have the assessment on its franchise raised, then on file with the Board of Equalization, would be taken

up and acted on by the Board at its chambers at the New City Hall, on Saturday, June 25, 1881, at ten o'clock A. M., and it was thereby cited to appear and then and there show cause why the petition referred to should not be granted. This notice issued by an order of the Board made on the twenty-fourth of June, 1881, and was served on the same day by leaving it at the office of the company, as stated with regard to the notice first mentioned.

On the twenty-fourth of June, 1881, the Board took up the application to increase the valuation of the franchise of the Spring Valley Water Works. Charles N. Fox, Esq., attorney, then appeared and protested on behalf of the Spring Valley Water Works against a consideration of the application made in reference to said Water Works at that time, for want of jurisdiction on the part of the Board, inasmuch as the Board had adopted no rule prescribing the form and manner of notice, and therefore any further action by the Board would be in violation of law; and that sufficient time was not allowed the Spring Valley Water Works as contemplated by law to prepare and present its case. He (Fox) stated that a notice had been served upon the Secretary of the company on the afternoon of the preceding day, at four o'clock, just at the time of the closing of the office, to appear before the Board this morning. Afterwards, on the same day, Mr. Fox reiterated his objections to the Board's proceeding, and stated that the President of the company was out of town when the notice was served on the Secretary, and the notice to the president to appear was not received by him until this morning—meaning the morning of the twenty-fourth.

The Board determined the question of jurisdiction adversely to the contention of Mr. Fox. He (Fox) then requested that the hearing of the case be postponed until the next day (Saturday) or the Monday following, so as to give the company an opportunity for preparation and consultation. A like request for postponement on behalf of the San Francisco Gas Light Company was also made (the cases of these two companies were heard together), and on motion further action in the cases of the Spring Valley Water Works and the San Francisco Gas Light Company was postponod until the fore-

noon of the next day, Saturday, twenty-fifth of June, at ten
o'clock. On the next day (twenty-fifth of June) at the re-
quest of R. P. Clement, Esq., who appeared on behalf of the
San Francisco Gas Light Company (the case of the company
last named being heard with that of the Spring Valley Water
Works), and requested a further postponement of the cases
of both companies until two o'clock on that day, for the pur-
pose of allowing the respective counsel to have a consultation
with the officers of the companies as to these cases. The
cases of the above mentioned companies were afterwards on
same day taken up for hearing, when the attorneys were
called on to make an admission as to the value of the stock
of the companies mentioned. Thereupon Mr. Fox stated that
on yesterday he agreed, if ever the case reached that point,
that he would admit that the market value of the stock (re-
fering to the Spring Valley Water Works stock) on the sev-
enth day of March, 1881, was par, reserving the right to
object to its relevancy, but that on reflection he declined to
appear for the water company further than to make the
point made at the preceding meeting to the jurisdiction of
the Board for want of notice to the company, and to repeat
that no notice had been yet given the company. After this
the Board proceded to act upon the case of the Spring Valley
Water Works, and raised the assessment as above stated.

It thus appears that after the Board had passed on the
question of jurisdiction, Mr. Fox, who represented the Water
Works, asked for a postponement of the case of the Water
Works, which was granted, and that subsequently another
postponement was granted. After this he declined further to
appear, announcing his determination to rest on the question
of jurisdiction.

It also appears that a notice addressed to the company
was served on it on the twenty-fourth of June, to appear on
the next day and show cause why the assessment of its fran-
chise should not be raised, and that on request, two postpone-
ments were granted the company.

It is urged that the company was entitled to ten days'
notice that the Board would act, by virtue of the provisions
of Section 3681 of the Political Code. But that section has

no application to such a case as this, as a careful perusal of it will show.

Mr. Fox appeared for the company on the notices served, and by such appearance we hold that all objections of mere form to the notice are waived. As to the reasonableness of the time given by the notice to the corporation to show cause, that is in a great measure left to the discretion of the Board of Supervisors. We can not, under the circumstances, hold it unreasonable. The Board has but a limited period under the law, to act on the assessment book, and the range of inquiry is within narrow limits. In determining the point as to the time allowed, we think it proper to take into consideration the fact that postponements were granted to the corporation whenever asked, up to the time that Mr. Fox withdrew from the case and declined to act further for the company. This withdrawal and declination took place under circumstances which indicate that every reasonable request for time would have been granted by the Board. Even after the withdrawal of Mr. Fox, distinguished gentlemen (F. G. Newlands and R. P. Clement, Esquires), learned in the law, were by the Board heard at length as taxpayers in regard to the matter. It was claimed by them "that there was no franchise enjoyed by the Water and Gas companies." It is a fair inference from this, that these gentlemen were heard in support of the pretensions of these companies. We refer to this last action by the Board as a clear indication that every reasonable request for the time would have been allowed.

In our opinion (as intimated in *Patten* v. *Green*, 13 Cal. 330), such tribunals as the Boards of Supervisors ought not to be held to any great strictness of procedure in the matters above discussed herein; and if, under a rule or an order of such Boards, a party has notice of the intended action of a Board of Supervisors sitting as a Board of Equalization in regard to the assessment of his property, in time to have a full and fair hearing during the sessions of the Board, we shall hold such notice to be sufficient, unless it appears affirmatively that a full and fair hearing was denied him by the action of the Board. Of course, the rule as to time here laid down, is not intended to apply to a case where the law requires a notice of a definite number of days to be given, and

no such notice has been given. We think the contentions of the appellant as to notice are untenable.

But it is said that there is a lack of jurisdiction of the subject-matter, that the Spring Valley Water Works has no property liable to assessment of the character of that upon which the increased valuation was placed by the Board of Equalization.

It appears from the petition, that the Spring Valley Water Works was a corporation prior to the seventh day of March, 1881, organized and existing under the laws of this State, having its principal place of business and doing business in the city and county of San Francisco. All corporations organized under the laws of this State, are, by the general law, vested with certain powers by express grant. This has been so since the passage of the first Act, in 1850, in relation to corporations. (See Sections 1 and 2 of the Act of 1850, in Hittell's Gen. L., 114, 115, as to corporations created prior to the Codes; as to those since, see Civil Code, §§ 354, 355.) They are invested with further powers by the particular Act under which they are incorporated, or by the title of the Code under which they are formed.

It appears from the statement of one of the counsel for petitioner, that the Spring Valley Water Works is a corporation formed and doing business under an Act passed April 14, 1853, for the formation of corporations for business and commercial purposes, and an Act passed April 22, 1853, entitled "An Act for the incorporation of water companies."

Under the laws of the State this corporation has power to have succession by its corporate name for a period of time (which must not exceed fifty years), to sue or be sued in any Court, to make and use a common seal and alter the same at pleasure, to hold, purchase, and convey such real and personal estate as the purposes of the corporation shall require, to appoint such subordinate officers and agents as the business may require, to make by-laws, not inconsistent with any existing law, for the management of its property, the regulation of its affairs, and the transfer of its stock, as well as all power necessary to the exercise of the expressly granted powers. (See sections of Act of 1850 above cited, and § 4 of Act of 1853 above referred to; Hittell's Gen. Laws, pp.

147, 148.) It has also the power under the Act of 1858 (see Stats. 1858, p. 213), to purchase or to appropriate and take possession of, and to use and hold, all such lands and waters as may be required for the purposes of the company, upon making compensation therefor. This last power enables the corporation to purchase the land and waters required for its business against the will of the owner, by availing itself of the provisions of the laws for the condemnation of land; in other words, to acquire such lands by the exercise of the power of eminent domain. It has the right also under the Act of 1858, subject to the reasonable direction of the Board of Supervisors, to use so much of the streets, ways, and alleys, of the City of San Francisco, as may be necessary for laying pipes for conducting water into the city, or any part of it, and also the right to furnish water to the inhabitants of the City and County of San Francisco, and, as this Court has recently determined, to the city also. The water so furnished is to be paid for at rates to be fixed each year in a mode established by law. A further power or right inhering in this company by the laws of the State, was the power or right to divide its capital stock into a number of shares, which are personal estate, each share representing a minute fractional part of such stock, and each share capable of ownership, of being sold and bought and transferred by a simple process of passing by will, or to one's heirs after his death through the medium of an administration, and each share securing to the owner a right to participate in the profits and property of the company.

The Spring Valley Water Works, on and prior to the seventh day of March, 1881, existed and had the right given by law to exist, with the powers and rights above set forth. It should be added here that the before mentioned powers or privileges were supplemented by a further grant, which inured to the advantage of the petitioner, which will be found in the third section of the Act of 1858, by which all the privileges, immunities, and franchises that might be thereafter granted to any individual or corporation relating to the introduction of fresh water into the City and County of San Francisco, or into any city or town in this State, for the use of the inhabitants thereof, were also granted to all companies

incorporated before or after the passage of that Act. This last grant is a very important and valuable privilege, and, in fact, has been very valuable to the Spring Valley Water Works.

Blackstone says, in relation to franchises: "Franchise and liberty are used as synonymous terms; and their definition is a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject. Being therefore derived from the crown, they must arise from the king's grant; or in some cases may be held by prescription, which as has been frequently said, presupposes a grant. The kinds of them are various, and almost infinite;" and adds, "that they may be vested in either natural persons or bodies politic; in one man or in many." And again on this subject he says: "To be a county palatine is a franchise, vested in a number of persons. It is likewise a franchise for a number of persons to be incorporated, and subsist as a body politic, with a power to maintain perpetual succession, and do other corporate acts; each individual member of such corporation is also said to have a franchise or freedom." (2 Bl. Com. 37.)

Kent defines franchises as "privileges conferred by grant from government, and vested in individuals." (3 Kent's Com. 458.) He also says: "Corporations or bodies politic are the most usual franchises known in our law." (Id. 459.)

In *Pierce* v. *Emery*, 32 N. H. 507, Perley, C. J., speaking for the Court remarks: "A corporation is itself a franchise belonging to the members of the corporation; and a corporation being itself a franchise, may hold other franchises as rights and franchises of the corporation." And further: "A corporation, being itself a franchise, consists and is made up of its rights and franchises."

In *City of Bridgeport* v. *N. Y. & N. H. R. R. Co.*, 36 Conn. 266, Butler, J., speaking for the Court, uses this language in regard to a railroad corporation: "The term 'franchise' has several significations, and there is some confusion in its use. The better opinion deduced from the authorities, seems to be that it consists of the entire privileges embraced in and constituting the grant." (See Title "Franchise" in Abbott's Law Dict., and cases there cited.)

It is true that the privileges so granted by the Government

do not pertain to the citizens of the State by common right. But what is the "*common right*" here referred to ? Is it not a right which pertains to the citizens by the *common law,* the investiture of which is not to be looked for in any special law, whether established by a Constitution or an Act of the Legislature ? Coke says: "*De commun droit*—of common right— this is by the common law, because the common law is the best and most common birthright that the subject hath for the safeguard and defense not only of his goods, lands, and revenues, but of his wife and children. * * * This common law of England is sometimes called right, sometimes common right, and sometimes *communis justitia.*" (Coke's Inst. 142*a.*) The definition of franchises as special privileges conferred by Government upon individuals, and which do not belong to the citizens *of the country generally* of common right, had its origin in *Bank of Augusta* v. *Earle,* 13 Pet. 575. A very learned and accurate writer, Mr. Emory Washburn, in his work on Real Property (2 vol. 267), adopts this definition and cites as authority the case above referred to from 13 Peters. The same definition is quoted by Angell & Ames in their work on Corporations, from the case referred to. (See Ang. & Ames on Corp., § 4.)

In the case in 13 Peters it was contended that under the laws and Constitution of Alabama the right of banking was a franchise. The Court refused to so hold, on the ground that the right of banking, *at common law,* belonged to every citizen. (See also *Curtis* v. *Leavitt,* 15 N. Y. 170, opinion of Shankland, J.) The discussion on the point in the opinion shows clearly that "common right" is used with the signification of common law."

We are of opinion that the common right refers to the right of citizens generally at common law. Such rights of citizens, though frequently spoken of as franchises, are not the franchises here meant; and it may be conceded that where such rights are granted to corporations, they are not franchises. But independent of the right to exist as a corporation, and to exercise powers in its corporate capacity, there are privileges granted to the Water Works, which do not, by the common law, belong to citizens generally; such as the right to lay down pipes in the streets, ways, and alleys

of a city, and to collect rates for water furnished, which was held to be a franchise in *San Francisco* v. *Spring Valley Water Works,* 48 Cal. 493, and in *San José Gas Co.* v. *January,* 57 id. 616. Conceding for the argument that the Constitution, by Section 19 of Article xi., grants this right to every person, it does not follow that it is not a franchise. They are vested by a grant of the sovereign power, and not by the common law; and the generality of the grant does not deprive them of the character of franchises.

The right to collect rates for use of water supplied to the City and County of San Francisco, or the inhabitants thereof, which the appellant has possessed at least ever since the Act of 1858 went into effect, is expressly declared to be a franchise by the Constitution of the State in the second section of Article xiv. thereof. As has been said above, the very existence of a corporation as such is a franchise, and it exercises its franchise in every act which it performs as a corporation. In *The Bank of Augusta* v. *Earle,* above cited, the Supreme Court of the United States, speaking through Taney, C. J., in relation to the making of contracts by corporations, which, by common right, individuals could make, said : "In making such contracts, a corporation, no doubt, exercises its corporate franchise. But it must do this whenever it acts as a corporation, for its existence is a franchise."

A corporation, whose existence is a franchise, may possess powers and privileges, which, in themselves, are not franchises (such as the right to bank, discussed in *Bank of Augusta* v. *Earle,* above cited, or the right to buy and sell property, real and personal), but it usually owns, along with such privileges, some that are franchises ; but whether the powers be entirely of the kind which are franchises or not, its existence and right to employ its corporate powers is a franchise. This we think abundantly established by the cases above cited.

We have no doubt that it was the intention of those who framed and ratified the Constitution to place such franchises in the category of property to be taxed. The word "*franchises,*" as used in the first Section of Article xiii., is used generally without any qualifying words, and is intended to embrace all franchises of the character above referred to,

whether vested in individuals or bodies politic. A franchise conferred on an individual to lay down pipes in the streets of a city and to collect rates for water furnished a city or its inhabitants is to be taxed in the same way as when vested in corporations. The law in this respect is the same in regard to all persons, whether natural or artificial.

It is contended that the clause "and all other matters and things real, personal, and mixed, capable of private ownership," in Section 1 of Article xiii. qualifies the word "franchises," which precedes it. We do not think so. The structure of the sentence forbids any such construction. What is said before the employment of these words is complete of itself, and needs nothing to show what was signified. The words used show clearly that they were intended to add something to what preceded them, to refer to kinds of property not previously mentioned, not to qualify anything. They were doubtless inserted out of abundant caution to show that all kinds of property, whether specifically enumerated or not, were intended to be included in the property to be taxed, though not embraced in the specific classes previously mentioned. They constituted a declaration. that in enumerating the property to be taxed it was not intended to confine the enumeration to "moneys, credits, bonds, stocks, dues, franchises," but to include all other kinds of property, and that by no construction of the word property, as used in the section, were any kinds of property to be left out.

But it is immaterial whether these words qualified "franchises" or not, for the reason that the franchises so referred to are capable of private ownership. To hold that a private corporation does not own its franchise right, power, and privileges would be both novel and untenable. Admitting that under the law of the State there may be legislation which might impair their value, it does not follow that it is not owned as property, with all the rights which attach thereto. All these rights exist until the legislative authority has acted so as to impair them or take them away; and until such legislation is enacted the rights of property remain unimpaired. There has been no legislation yet of the character as regards the appellant that has been called to our attention, or that we have been able to discover.

This franchise of a corporation is sometimes classed as real estate—of that kind styled incorporeal hereditaments. (*Enfield Toll Bridge Co.* v. *Hartford and New Haven R. R. Co.*, 17 Conn. 40; S. C., Id. 462; *Price* v. *Price's Heirs*, 6 Dana, 107; 1 Blackstone's Com. 20–22, 37, 38.) In the case cited from 17 Conn. 40, this was said of a bridge corporation. The shares of stock of the Water Works are by statute made personal estate. (See Act of 1853.) But whether real or personal estate, they are property. Such franchises, as long as they exist, are protected *as property* by the guarantee universal in the States of the Union, which forbids their being taken except for public purposes and on compensation being made. (1 Cooley's Con. Lim., 4th ed., 655, and cases cited in note 4.) During their existence they are as fully protected by law as any other species of property. On this subject see *Wilmington R. Co.* v. *Reid*, 13 Wall. 268; 3 Kent's Com. 458; *Hamilton Co.* v. *Massachusetts*, 6 Wall. 633; *People* v. *Selfridge*, 52 Cal. 331; *T. & T. R. Co.* v. *Campbell*, 44 id. 89; *O. R. R. Co.* v. *O. B. & F. V. R. R. Co.*, 45 id. 365. (See cases just above cited from 17 Conn., and *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 Conn. 36.)

The franchise of a corporation is and can be well defined to be the right of the corporation to exist and exercise the powers and privileges vested in it by its charter. (Burr. on Tax., § 83.) The franchise is the faculty of the corporation. As said by Redfield in his work on Railways: "The faculty of a corporation is its organic life; its corporate existence by which it is enabled to carry on business; that which it derives from its charter of incorporation, its corporate franchise." (2 Redf. on Railways, 3d ed., 452.) In this State, the charter is the statute or statutes granting and defining the powers of the corporation, under which it is constituted and exists, together with the instruments required to be executed by the provisions of such statute or statutes. These are sometimes called the constating instruments. (Field on Corp., § 34, n. 3.) Such franchises are legal estates, not mere naked powers, and are powers coupled with an interest, which vest in the corporation by virtue of its charter or constating instruments. (*Society for Savings* v. *Coite*, 6 Wall. 606; *Provident Institution* v. *Massachusetts*, id. 622; *Hamilton Co.* v. *Massachusetts*, id.

638; *Porter* v. *R. R. I. and St. L. R. R. Co.*, 76 Ill. 561.) That
the State has full power to tax them, see same cases, and *State
R. R. Tax Cases*, 92 U. S. 603. In the case from 76 Illinois,
above cited, it is said: "It is clear upon authority that the
franchise of a corporation is property, and as such it may be
a proper object of taxation." (P. 573.) In *Veazie Bank* v.
*Fenno*, 8 Wall. 547, Chase, C. J., used this language: "Fran-
chises are property, often very valuable and productive prop-
erty, and seem to be as properly objects of taxation as any
other property." Daniel, J., delivering the opinion of the
Court in *West River Bridge Co.* v. *Dix et al.*, 6 How. 529, said:
"We are aware of nothing peculiar to a franchise which can
class it higher, or render it more sacred than other property.
A franchise is property, and nothing more." (See also *Wil-
mington R. R. Co.* v. *Reid*, 13 Wall. 264, and *Monroe Savings
Bank* v. *The City of Rochester*, 37 N. Y. 367.) In this last
case Fullerton, J., delivering the opinion of the court, said, in
regard to a statute declaring the privileges and franchises
granted by the Legislature to savings banks or institutions
for savings, personal property, and liable to taxation as such:
"In declaring the privileges and franchises of a bank to be
personal property, the Legislature has adopted no novel prin-
ciple of taxation. The powers and privileges which consti-
tute the franchise of a corporation are in a just sense prop-
erty, and quite distinct and separate from the property, which,
by the use of such franchise, the corporation may acquire.
They are so regarded by the law, and so regarded by common
acceptation."

That such franchises can be taxed according to the valuation
arrived at through an assessment is recognized in *The Case of
the Freight Tax*, 15 Wall. 282, and in the case of *The State
Tax on Railway Gross Receipts*, id. 296. In the case of the
*State Railroad Tax Cases*, above cited from 92 U. S. Reports,
a tax on the assessed value of franchise and capital stock by
the State of Illinois was sustained, approving the decision to
that effect in *Porter* v. *R. R. I. & St. L. R. R. Co.*, above cited
from 76 Illinois. (See also *Gordon* v. *Appeal Tax Court*, 3
How. (U. S.) 133, and Judge Redfield's comment on this case
in 2 Redf. on Railways, 453.) As to the extent of the power
of the State to tax, see *Providence Bank* v. *Billings*, 4 Pet.

562, and *Hamilton Co.* v. *Massachusetts*, 6 Wall. 639.   In the case in 4 Peters, Marshall, C. J., said: "All powers  *  *  * over which the sovereign power of a state extends are subjects of taxation.   The sovereignty of a State extends to everything which exists by its authority, or is introduced by its permission." (4 Pet. 563.)  The same doctrine was declared in *Osborne* v. *Bank of the U. S.*, 9 Wheat. 738.   From the foregoing cases, it would seem that there can be no doubt of the power of a State to tax the franchise at its assessed value. There may be more difficulty in arriving at its value than that of a parcel of land or personal chattels, but still its value may be estimated.   When it is condemned for public use, the compensation to be paid can be fixed.   As is justly said in *Porter* v. *R. R. I. & St. L. R. R. Co.*, 76 Ill. 578: "We have never known it to be asserted that the value of a franchise is so indefinite and uncertain that it can not be made the measure of a recovery when it is wrongfully invaded; or that when it is taken and condemned for public use, it can not be ascertained what compensation shall be made to its owner.   It is recognized in those respects as being capable of a definite valuation.  *  *  *   If its value may be ascertained for those purposes, it may as readily be ascertained for the purposes of taxation."  As to value of franchises, and that they possess a value beyond that belonging to the tangible property of the corporation, see cases just above cited. (*Commonwealth* v. *Hamilton Mfg Co.*, 12 Allen, 298, and *Commonwealth* v. *Cary Improvement Co.*, 98 Mass. 23.)

In this State, the Constitution having declared that franchises are property, and that all property in the State not exempt from taxation shall be assessed in proportion to its value, to be ascertained as provided by law (Const., Art. xiii., § 1), it would seem to follow that the tax must be according to the valuation made by the officer appointed for that purpose.   If the State can impose a tax on the franchise of a corporation in the nature of an excise or duty, it does not exclude the taxation by a valuation made by an Assessor.

That such a franchise as that held by the appellant was taxable in this State, we think has been held by this Court in two cases: *Burke* v. *Badlam*, 57 Cal. 594; and *San José Gas Company* v. *January*, id. 614.   In *Burke* v. *Badlam*, an

application was made to this Court for a writ of mandate to compel the Assessor of the City and County of San Francisco to assess to certain holders of certificates of stock in various corporations the respective shares held by them in such corporations, respectively, etc. The corporations mentioned in the petition for the writ were the Nevada Bank of San Francisco, the San Francisco Gas Light Company, the Golden City Chemical Works, the Selby Smelting and Lead Company, and the Virginia and Gold Hill Water Company. This proceeding was with reference to the assessment of 1881-82.

In deciding the case, the Court properly assumed, as it had a right to do, nothing appearing to the contrary, that the Assessor would assess in due time, to the various corporations, all of their property of every character, as required by the law.

It was claimed by the petitioner, according to the report of the case, that the Assessor must assess to the respective corporations all of their property of every kind, including their franchise, and to the individual stockholders thereof, the respective shares of the capital stock held by them. "If this would, in effect," said the Court, per Ross, J., " be assessing the same property twice for the same tax, it can not be done." (57 Cal. 600.) The Court then proceeds to declare that under the Constitution double taxation was neither required nor permitted, but was forbidden, and then passes to the consideration of the question whether an assessment as contended for (stated above) would be, in effect, assessing the same property twice for the same tax.

In discussing this question, the Court, after referring fully to the first section of Article xiii. of the Constitution, said: "Now, what is the stock of a corporation but its property, consisting of its franchise and such other property as the corporation may own ? Of what else does its stock consist ? If this is taken away, what remains ? Obviously, nothing. When, therefore, all of the property of the corporation is assessed—its franchise, and all its other property of every character—then all of the stock of the corporation is assessed, and the mandate of the Constitution is complied with." Further on in the opinion, this is said: "To assess all of the cor-

CAL. REPS. LXII—8

porate property of the corporation, and also to assess to each of the stockholders the number of shares held by him, would, it is manifest, be assessing the same property twice, once in the aggregate to the corporation, the trustee of all the stockholders, and again separately to the individual stockholders, in proportion to the number of shares held by each. As well might it be contended that the property of a partnership should be assessed to the firm, and, in addition, that the interest of each partner in the firm property should be assessed to him individually. If I have an interest in partnership property, my interest therein is property. It is the right I have to share in the profits and property of the firm, in proportion to the interest I own. But my property rights are confined to the property held by the firm, just as the property rights of the stockholder in the corporation are confined to the property held by the corporation. In the case of the partnership, take away all the property of the firm, and I have no longer any property as a partner. In the case of the corporation, take away all its property, which, it must be remembered, includes its franchise, and the stockholder has no longer any property. (57 Cal. 601–2.)

The conclusion is reached, that when the law is complied with by assessing all the property of the corporation, which property includes *the franchise* of the corporation, to assess the shares would be double taxation; because it would be, in effect, to assess the same property twice for the same tax, which the Constitution forbids. It is held in the judgment pronounced, that the franchise of a corporation of the character of those named in the petition, is the property of the corporation, and that, as property, it is taxable.

In *San José Gas Company* v. *January*, 57 Cal. 614, this Court held, that the tax of a franchise was legal. The franchise in that case pertained to a corporation for manufacturing and selling gas to the city and inhabitants of San José. The particular franchise to which the attention of the Court seems to have been directed in that case, was, that of using the streets, and laying pipes therein, for supplying a city with gas. The Court said this was a franchise, and by Section 1 of Article xiii. of the Constitution, franchises are declared to be property for purposes of taxation. It was ar-

gued for appellant that such a franchise, as the one mentioned, had no value.   It was said by the Court, *per* MYRICK, J., in reply to this contention: " The method of assessment, and by whom, was to be and was provided by law.   Therefore, it does not rest with the plaintiff, nor with the Courts, to determine that its franchise had no value.   In a pecuniary sense, the value of franchises may be as various as the objects for which they exist, and the methods by which they are employed, and may change with every moment of time; but that franchises are property, and are to be taxed in some method in proportion to value, is a part of the paramount law of this State."

At the time that the action to which this case relates was taken by the Board of Equalization, and at the time at which the matters in controversy in *Burke* v. *Badlam* originated, the Legislature had acted in regard to the assessments of property, and enacted as follows:

"Shares of stock in corporations possess no intrinsic value over and above the actual value of the property of the corporation which they stand for and represent, and the assessment and taxation of such shares and also of the corporate property would be double taxation.   Therefore all property belonging to corporations shall be assessed and taxed, but no assessment shall be made of shares of stock; nor shall any holder thereof be taxed therefor."   (Pol. Code, § 3608.)   (It may be remarked here that the constitutional validity of this section was affirmed in *Burke* v. *Badlam*.   See 57 Cal. 602.)

"All property in this State not exempt" (stating the exemptions allowed by the Constitution, etc.) "is subject to taxation as in this Code provided."   *   *   *   (Pol. Code, § 3607.)   In Section 3617 Political Code, which is a definition of terms employed in relation to revenue and taxation, it is provided that "the term 'property' includes moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership."   It is further provided in the same section, that "the terms 'value' and 'full cash value' mean the amount at which the property would be taken in payment of a just debt due from a solvent debtor;" and that "the term 'personal property' includes everything which is the subject of ownership

not included within the meaning of the term real estate." In the Political Code the word person includes a corporation, as well as a natural person. (§ 17.) Each person (which includes corporations) must furnish a statement of property, real and personal. Each person must insert in the statement of his property "all property belonging to, or claimed by, or in the possession, or under the control or management of any corporation of which such person is President, Secretary, Cashier, or Managing Agent." (Pol. Code, § 3639, Subs. 1, 2, 3.)   As *property* includes *franchise*, the latter must be inserted in the statement.

The Assessor must prepare an assessment book, with appropriate headings, etc., in which must be listed all property within the county. In this assessment book must be specified in a separate column, under its appropriate head, all personal property, showing the number, kind, amount, and quality, and also the cash value of all personal property, exclusive of money.   (Pol. Code, § 3650, Subs. 4 and 10.)

In subdivision 15 of the same section it is provided that " each franchise must be entered on the assessment roll, without combining the same with other property, or the valuation thereof."

The Assessor must complete the assessment book on or before the first Monday in July in each year (Pol. Code, § 3652), and as soon as completed he must deliver this book, with the map book (see § 3653) and *statements*, to the Clerk of the Board of Supervisors, who must immediately give notice thereof and of the time the Board will meet to equalize assessments, * * * and in the mean time the book must remain in his office for the inspection of all persons interested. (§ 3654.) The section in relation to the power of the Board to equalize, so far as material herein, has been already quoted. (§ 3673.)

The power to act on each and every assessment is conferred on the Board, and to increase or lower it so as to make it conform to the true value in money of the property mentioned therein.

The above citations from the Political Code show that the Board has full power to act on the assessment of the franchise and increase or lower it as provided in section 3673.

It appears from the record in this case that the Board of Supervisors, in the exercise of its power of equalization, assessed the franchise of the Water Works by taking the aggregate of the market value of the shares of stock in the company on the seventh of March, 1881, and deducting therefrom the value of the real and personal property of the company, and held the difference to be the value of the franchise. The market value of the shares was shown to the Board by the testimony of *witnesses*. Such a mode of arriving at the value of the franchise appears to have been adopted by the Assessor in *San José Gas Co.* v. *January*, 57 Cal. 614, and this mode was held to be within the powers vested in the Assessor. It was also impliedly approved as a correct mode in *Burke* v. *Badlam*, above cited. (See *Commonwealth* v. *Hamilton Mfg. Co.*, 12 Allen, 306.)

If such power is vested in the Assessor, it was also vested in the Board of Supervisors in exercising their powers under the Constitution and statute of this State. (See Pol. Code, § 3679, as to what the Board may use in its function of equalization.)

In addition to what has been said above as to the action of the Legislature, it should be stated that on the same day on which it passed Section 3608 of the Political Code above quoted, it repealed Section 3640 of the same Code, which was as follows: "Each person, firm, or corporation, owning or having in his or its possession any of the shares of the capital stock of any corporation, association, or joint stock company, shall be assessed therefor. If the corporation, association, or joint stock company has its principal place of business in this State, the assessable value of each share of its stock shall be ascertained by taking from the market value of its entire capital stock the value of all property assessed to it, and dividing the remainder by the entire number of shares into which its capital stock is divided. The owner or holder of capital stock in corporations, associations, and joint stock companies whose principal place of business is not within the State, must be individually assessed for such stock. Shareholders, in the statement required by Section 3629 of this Code, shall specify the number of shares of stock held by them, and the name of the corporation. The owner of

shares of stock, to be entitled to the deduction provided for in this section, must produce to the Assessor a certificate of the assessment of the property of the corporation, association, or joint stock company."

By this section, which was repealed as above, it will be seen that the whole property of the corporation including franchise and other assessed property, would have been taxed. This was by the operation of the section to have been brought about by taxing the shares to each owner of shares in the manner indicated by its provisions. But by declaring, as was done in Section 3608, that shares of stock were not to be taxed because they possessed no intrinsic value over and above the value of the property of the corporation which they stand for and represent, and as taxing of the shares and property both, would be double taxation, and therefore the shares should not be assessed, but the property should, no doubt it was their intention to tax everything in the shape of property owned by the corporation; that everything entering into and giving value to the shares should be taxed. It can not be doubted that the Legislature in acting on the subject of revenue and taxation during the Session of 1881, did not intend to leave the system in relation to so important a matter in such a shape, that so large an amount of property as indicated by the difference between the market value of the shares of cor-porations and the value of the tangible property of such corporations, should escape taxation. To come to any other conclusion, would be to impute to that body a most culpable dereliction of duty.

There is a further point which we think it proper to notice. It is contended that good-will enters into and forms an element in the value of the shares of stock. No case has been produced to us, nor have we been able to find any holding or even intimating that this is so. We find no such element of value in the least hinted at, by any one who has written on the subject, nor has any such been called to our attention. We can not recognize any such element as giving value to shares in a trading corporation. It would be strange to predicate good-will as pertaining to or extending to an abstraction, to an " artificial being, invisible, intangible, and existing only in contemplation of law."

Our conclusion is that the Board of Supervisors in its capacity of a Board of Equalization, had jurisdiction of the person and subject-matter in the matters involved in this cause, and the judgment of the Court below is affirmed.

ROSS, MYRICK, McKINSTRY, McKEE, and SHARPSTEIN, JJ., concurred.

MORRISON, C. J., took no part in this decision.